# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01062-COA

**RICHARD MOATES**                                                            **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                      **APPELLEE**

DATE OF JUDGMENT:               10/17/2022
TRIAL JUDGE:                    HON. MICHAEL M. TAYLOR
COURT FROM WHICH APPEALED:      LINCOLN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:         OFFICE OF STATE PUBLIC DEFENDER
                                BY: MOLLIE M. McMILLIN
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:              DEE BATES
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 02/06/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. A Lincoln County grand jury indicted Richard Moates for first-degree murder (Count 1), burglary of a dwelling under circumstances "likely to terrorize the occupants" (home invasion) (Count 2), and simple domestic violence (Count 3) after he went to his estranged wife's home and shot and killed her boyfriend in front of her. Following a jury trial, Moates was convicted of all counts. Moates moved for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. After a hearing, the trial court denied both requests.

¶2. The trial court sentenced Moates to life imprisonment and a $10,000 fine for his

murder conviction; to twenty-five years, with fifteen years suspended and ten years to serve, followed by five years of post-release supervision for his home invasion conviction; and to six months to serve for his simple domestic violence conviction, all to be served consecutively in the custody of the Mississippi Department of Corrections.

¶3. On appeal, Moates asserts that (1) the trial court erred by denying his motion to sever the murder charge from the other two charges in the indictment; (2) the trial court erred in allowing the State to introduce prior-bad-acts evidence against him through witness Brittany Tanksley; (3) the evidence is insufficient to sustain a conviction for simple domestic violence; and (4) the doctrine of retroactive misjoinder requires that his convictions for murder (Count 1) and home invasion (Count 2) be reversed and his case be remanded for a new trial on these counts. For the reasons addressed below, we affirm Moates's convictions and sentences.

## STATEMENT OF FACTS[1]

¶4. Cortney and Richard Moates were married for about four years and had two children. They separated in April 2020 when the children were ages six and three. Cortney and the children moved into her mother's home at 2565 Haley Trail in Wesson, Mississippi. Moates lived in Memphis at the time. Cortney testified that she planned to divorce Moates, but he did not want a divorce. Cortney testified that she left Moates after he "put his hands on

---

[1] Pretrial proceedings relevant to issues Moates raises on appeal are discussed in context.

[her]."

¶5.     Brittany Tanksley, Cortney's best friend of twenty-four years, testified that even after Cortney and Moates separated, they argued "constantly on and off," and Cortney's intention to get a divorce never changed. Tanksley testified about a specific phone conversation that took place earlier in December 2020 between her and Moates. Moates was angry when he learned that Cortney had left their children with Tanksley's parents—a member of law enforcement and a teacher. Tanksley testified that when she talked to Moates to defend the decision, Moates responded by threatening to kill her and her family, as well as Cortney.

¶6.     Cortney testified that she met Tyler McLeod (the victim) the month she moved back to Wesson after she separated from Moates. Cortney and Tyler were friends at first, and later their relationship became romantic, with Tyler occasionally staying overnight with Cortney.

¶7.     Cortney testified that she had seen Moates "about a handful" of times after they separated when they would meet for the children to go and see him. She thought Moates knew about Tyler because one of her children had mistakenly called Moates "Tyler" during a visitation exchange. She never told Moates she was dating anyone, and she did not know whether Moates knew the extent of the relationship.

¶8.     On December 23, 2020, Moates made plans with Cortney for him to come down from Memphis to take Cortney and the children to dinner. Cortney testified that she agreed to go to dinner with Moates and that "she wanted to make it as normal as possible for the kids." The plan was for Moates to celebrate Christmas with the children at the hotel where he was

3

staying, and then she and her family and Tyler would spend Christmas Day with the children. Cortney testified that after dinner, Moates texted and asked her to let him know when she made it home, and she did.

¶9.     Text messages admitted into evidence reflect that at 8:30 p.m. on December 23, 2020, Moates sent Cortney a text message and told her that the children "told [him] who Tyler was." He added that their son "said he had 2 daddy's [sic]." In that same text, Moates told Cortney, "He is dead before I leave." Moates continued to send Cortney text messages asking where Tyler was and threatening to come to her house. Eventually, Cortney blocked Moates's number so he could not message her anymore.

¶10.     Cortney testified that Tyler came to her house around 10:00 p.m. She helped Tyler wrap Christmas presents he had bought, and then she went to sleep because she had to work the next morning.

¶11.     After Cortney fell asleep, Tyler woke her up and showed her that Moates had started sending him messages through Facebook. Pictures of the Facebook messages that Moates sent to Tyler were admitted into evidence through Investigator Andrew Montgomery's testimony. At 11:21 p.m., Moates said:

- "What's up bitch when I find you I'm going to kill you."

- "Where you at."

- "Huh bitch where are you at."

- "Where are you. You made my daughter cry."

Following those messages, at 11:23 p.m., Moates called three times (via Facebook Messenger) within two minutes. After those calls went unanswered, Moates sent more Facebook messages at 11:24 p.m. that said:

- "You ain't in a relationship bitch."

- "Huh bitch."

- "Where are you."

¶12. Cortney testified that when Tyler told her Moates was sending him messages, she had been asleep, so she just looked at them but did not read them. She went back to sleep. But later she woke up to "[a] very, very loud, loud sound"; she did not know what it was. Then she saw Moates and Tyler at her bedroom door. Cortney testified that it looked like Moates was holding Tyler against him, and Tyler was telling Moates, repeatedly, "Please just let me live" and "Please let me have my life." Cortney testified that Tyler dropped to the ground but then got up and walked into her room. At this point, Cortney had not seen Moates with a gun. Moates walked into the room and said, "Nobody better find out about this." Then Moates turned around, lifted his arm, and shot Tyler. At that point, Corney saw Moates with the gun. When asked during cross-examination how Moates's threat made her feel, Cortney said, "Confused." Cortney later learned that Tyler had sustained two gunshot wounds—not just the one she witnessed.

¶13. While Moates was inside the home, the children were in Moates's truck outside. Cortney testified that after Moates shot Tyler, Moates went back to his truck. She called 911

5

and reported the shooting.

¶14.    Tyler was taken to the hospital where he later died.  Ricky Alford, the deputy coroner for Lincoln County, testified that he responded to the hospital after he received a report of Tyler's death.  Alford photographed Tyler's body, and these photos were admitted into evidence.  A number of the photos showed that Tyler sustained a gunshot wound that penetrated his chest from front to back.  Alford's preliminary report was admitted as Exhibit S-2, and in that report, Alford noted that Tyler's cause of death was a gunshot wound, and his manner of death was considered a homicide.[2]

¶15.    Regarding the investigation, Deputy Devin Owens of the Lincoln County Sheriff's Office testified that he responded to the 911 dispatcher's call reporting the shooting that happened on Haley Trail.  Dispatch advised that the suspect (Moates) was driving a white Ford F-250 truck.  Deputy Owens saw the truck on Heucks Retreat near Lake Lincoln Drive—5.4 miles from the reported Haley Trail address.  He initiated a stop.  When Deputy Owens stopped the truck, Moates held his hands out the window and said, "I don't have a gun."  Cortney and Moates's children were with Moates in the truck.  After the stop, Deputy Owens arrested Moates, and his truck was towed to the County's impound facility, where it was preserved so it could be processed.

---

[2] Dr. Michael Peavey, the emergency-room surgeon who treated Tyler, testified that Tyler suffered two gunshot wounds: one "superficial" wound was to his back, but another gunshot entered Tyler's right upper abdomen and lower chest and exited on the left side of his body.  Dr. Peavey testified that this other gunshot wound rendered Tyler unable to be resuscitated, which caused his death.

¶16. Andrew Montgomery, with the Lincoln County Sheriff's Office, investigated the case. He went to the scene (2565 Haley Trail) immediately after receiving the dispatch call. He was delayed due to stormy conditions and was briefed on the situation by two patrolmen who had arrived at the scene before him. He began photographing the scene, starting with the house's exterior. He was taken through these photographs at trial.

¶17. Investigator Montgomery testified that when he got to the door in the carport, he noticed that the door frame was busted, and it seemed the door had been forcibly opened. As he got closer, he saw that the door was damaged and that the locking mechanism (with wood still attached to it) was on the floor inside the house.

¶18. When he went upstairs to Cortney's bedroom, he noticed that the glass pane of the bedroom door was damaged around the doorknob, and it looked like it had been punched through. Investigator Montgomery testified that inside the bedroom, he saw a hole in the wall, but he did not find a projectile; it went through the wall and out of the house. As Investigator Montgomery looked through the bedroom, he noticed a spent shell casing against the wall, which he collected and sent to the crime lab. He testified that blood covered the carpet of the bedroom and went all the way to a set of French doors that led to a closed-in balcony. He photographed blood on the exterior side of one of the French doors as well as on its door handle. There was also blood on the bedding and some of the furniture. Investigator Montgomery said that large amounts of blood were throughout the house, but the largest concentration was in the bedroom on a rug and other parts of the floor. As he left

7

the home, Investigator Montgomery swabbed a spot on the entrance door, thinking the spot could be blood for testing. Investigator Montgomery then left the scene to go to the hospital to check on Tyler's status. After he had been there for about an hour, he and another investigator returned to the scene to search for a projectile, but they did not find one at that time.

¶19. After Investigator Montgomery finished processing the scene, he gave Brittany Tanksley permission to help Cortney clean the bedroom. Tanksley testified that as they were cleaning, she found a projectile near the French doors in a pile of rocks Cortney's son collected. She called Investigator Montgomery, who told her to take it to the sheriff's office, where he retrieved it. That projectile was sent to the crime lab.

¶20. At the sheriff's office, Investigator Montgomery met with Moates, took photographs of Moates's hands,[3] and swabbed both hands for gunshot residue (GSR) testing. Investigator Montgomery also photographed the clothes Moates wore the night of the shooting and sent the clothes for GSR testing.

¶21. Chad Suggs was admitted to testify without objection as an expert in trace evidence specializing in GSR. He testified the GSR analysis revealed that no particles indicative of gunshot residue were present on the submissions from the back of Moates's left hand, the

---

[3] These photographs were admitted into evidence and showed that the ring finger on Moates's right hand was injured and had a small cut, and his left hand appeared swollen, as Investigator Montgomery also testified based upon his observation when he met with Moates at the sheriff's office.

back of his right hand, or his right palm. But there were particles indicative of GSR on the submission from Moates's left palm and both sleeves of his shirt.

¶22. Investigator Montgomery executed a search warrant on January 4, 2021, and obtained a swab of Moates's DNA, which matched the blood that Investigator Montgomery had swabbed from the door inside the garage.

¶23. Investigator Montgomery also processed Moates's truck, taking photographs of the truck's exterior and interior and swabbing a substance that appeared to be blood for testing. He collected a cell phone from the truck that he sent for analysis, which was determined to be Moates's phone. Investigator Montgomery saw an empty holster for a semi-automatic handgun on the back floorboard, but he found no weapons in the truck. He also searched Moates's hotel room from that night but found no weapons there either.

¶24. Investigator Montgomery testified that a couple of days later, he did find a 9-millimeter gun between the location of the shooting and where Moates had been stopped. When Investigator Montgomery examined the weapon, he discovered that the gun was fully loaded but jammed by a spent casing that had not fully ejected. He was able to retrieve the projectile jammed inside. The gun, its magazine and ammunition, and the jammed casing were all submitted for analysis. Lori Beall was admitted as an expert in firearm identification and concluded that the projectile recovered from Cortney's room was shot from the recovered gun. She further concluded that the recovered shell casings had characteristics consistent with the recovered gun but could not be positively included "as having been fired

9

in the [recovered] gun . . . to the exclusion of all other firearms bearing the same class characteristics."

¶25.    Ashley Boldig was admitted as an expert digital forensics examiner and had captured the data in Moates's cell phone. She testified that between 9:12 p.m. and 11:58 p.m. on December 23, 2020, Moates called or tried to call Cortney a total of eighty-one times. Of those calls, Moates attempted to hide his caller identity fifty-nine times. Moates tried to call Cortney four times through Facebook Messenger. Moates also called his daughter sixty-nine times through Facebook Messenger and called Cortney's mother seven times during that time span. As noted, Moates called Tyler three times through Facebook Messenger. Around this time, Moates called contacts labeled "Eric Hart," "Beverly Lee," "Venecia Lee," and "Roman Brittany Tanksley" asking where Tyler was. In addition to sending a text message to Cortney stating, "He is dead before I leave," Moates also sent a text message to Cortney's mother, Rhonda White, stating, "I am going to kill him."[4] The extraction of Moates's phone contained the same messages Cortney and Tyler had received from Moates as shown by other evidence.

¶26.    Tanksley testified that she did not normally speak to Moates, and she had never told Moates that Cortney was in a romantic relationship with Tyler. At 11:07 p.m. on the night of the shooting, however, Moates sent Tanksley a series of messages through Facebook

---

[4] White testified and confirmed that she had talked to Moates about Tyler through text messages just before the shooting.

10

Messenger that she did not immediately receive because her phone's battery was dead. Through those messages, Moates said:

- "Where the f*ck is Tyler."

- "Boone [(sic)] makes my daughter cry."

- "You and your pedophile husband. Where the f*ck does Tyler work live what's he drive."

Boldig also testified that cell phone mapping showed that Moates's cell phone location tracked with him having been at Cortney's home between 11:51 p.m. and 11:55 p.m., which was the time that the shooting was believed to have happened.

¶27. The State rested, and Moates unsuccessfully moved for a directed verdict on all three counts against him. Moates did not testify, and the defense did not present any other witnesses. The defense rested. The jury unanimously convicted Moates on all three counts.

¶28. Moates filed a motion for a JNOV or, alternatively, a new trial. After a hearing, the trial court denied Moates's post-trial motion.

¶29. At his sentencing hearing, Moates told the trial judge, "I did not agree with the way my lawyers represented me . . . because I did not ever admit to shooting [Tyler]. . . . [A]ll the stuff the [prosecutor] and all them said about me [at trial] was a lie." Concluding, Moates said, "I just want to say I'm sorry for their loss . . . [, but] I just want to go on record and say I did not bust in no house with no gun, and I did not shoot nobody, and that's all I got to say." At the end of the sentencing hearing, the trial court declared that it "accepted the jury verdict in Cause No. 2021-175 which found Mr. Moates guilty on all three counts, and the Court has

11

heard from the victim's family [and] heard from Mr. Moates." The trial court then sentenced Moates as set forth above.

¶30. Moates appeals.

## DISCUSSION[5]

### I. Severance of the Charges in the Indictment

¶31. Moates asserts that the trial court erred when it denied his motion to sever the first-degree murder charge in Count 1 of his indictment from the home invasion and domestic violence charges in Counts 2 and 3. We disagree for the reasons addressed below.

¶32. Mississippi law provides that multiple offenses "may be charged in the same indictment with a separate count for each offense if . . . the offenses are based on the same act or transaction; or . . . the offenses are based on two . . . or more acts or transactions connected together or constituting parts of a common scheme or plan." Miss. Code Ann. § 99-7-2(1) (Rev. 2020). In deciding a motion for severance, the trial court "should pay particular attention to" three factors: "whether the time period between the occurrences is insignificant, whether the evidence proving each count would be admissible to prove each of the other counts, and whether the crimes are interwoven." *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991). This Court "employ[s] an abuse-of-discretion standard when reviewing a trial court's denial of a motion to sever a multi-count indictment." *Donaldson v. State*, 262 So. 3d 1135, 1164 (¶122) (Miss. Ct. App. 2018).

---

[5] The applicable standards of review for the issues addressed are discussed in context.

¶33.　Because Cortney and Moates were married when Moates shot and killed Tyler, Mississippi Rules of Evidence 504 and 601(b) are also relevant in analyzing the severance issue.　Rule 504 delineates Mississippi's spousal privilege, providing that "[a] person has a privilege to prevent the person's current or former spouse from testifying in a civil or criminal case about any confidential communication between them."　MRE 504(b).　"The privilege does not apply" in certain situations, however, including "in a criminal case when one spouse is charged with a crime against . . . the person or property of [] the other spouse; . . . [or] . . . a third person when committed during a crime against . . . [the other spouse]."　MRE 504(d)(2)(B).　Rule 601(b) provides that in cases in which one spouse is a party, "the other spouse may not testify as a witness in the case unless both consent, except: (1) when called as a witness by the spouse who is a party; (2) in a controversy between them; or (3) in a criminal case for [certain crimes against children]."　MRE 601(b).

¶34.　In one opinion, the supreme court discussed Rule 601(b) in the context of Rule 504 and found no error when a trial court allowed a defendant's estranged wife to testify with respect to kidnapping and burglary charges against the defendant involving her and her property, as well as the defendant's shooting and killing of her sister and shooting at her young son, crimes that both occurred during the kidnapping.　*Meeks v. State*, 604 So. 2d 748, 750 (Miss. 1992).　The supreme court recognized that pursuant to Rule 601(b), a wife may testify against her husband when she is the victim of his alleged criminal act.　*Id*. at 754. Further, and particularly relevant here, the supreme court also recognized that a wife's

13

competence to testify against her husband is not limited to cases in which she was the sole victim. *Id.* Rather, where multiple crimes involve different victims, one being the wife, the wife may testify against her husband if the charges "all ar[i]se out of the same episode or occurrence or . . . were bound by a common nucleus of operative fact." *Id.*

¶35.    In reaching this conclusion, the supreme court noted that in this context, to the extent the wife's "testimony included communications between herself and her estranged husband, she falls within a well defined exception to the husband-wife privilege." *Id.* Namely, "[t]here is no privilege . . . in a proceeding in which one spouse is charged with a crime against the person or property of . . . a third person committed in the course of committing a crime against any of the persons described in . . . this Rule." *Id.* (citing MRE 504). Applying this principle, the supreme court found that the trial court "handled the matter correctly" by allowing the wife to testify against her husband with respect to all four charges against him where the homicide charge involving her sister, and the assault charge involving her son, both arose out of the wife's kidnapping. *Id.*

¶36.    Similarly, in another case decided before the Rules of Evidence were in place, the supreme court held that the defendant's wife was a competent witness to testify "in a criminal prosecution of him for the murder of her father," *Maiben v. State*, 405 So. 2d 87, 89 (Miss. 1981), when that crime occurred during the "nearly simultaneous assault upon Mrs. Maiben by her husband and his threat to kill her 'next' on the occasion that he shot and killed . . . her father." *Id.* The supreme court explained that these circumstances created "such a

controversy between [Mr. and Mrs. Maiben]" that the very reason for the spousal privilege, to preserve "the sanctity of the marriage, ha[d] been destroyed." *Id.* at 89-90.

¶37.    In the case before us, Moates initially filed a motion in limine seeking to preclude Cortney from testifying against him under the spousal privilege (MRE 504).  He withdrew that motion, however, acknowledging at the hearing that the spousal privilege would not apply to Counts 2 (home invasion) and 3 (simple domestic violence) because Cortney was Moates's alleged victim.  Moates then moved to sever his murder charge from Counts 2 and 3, asserting that Cortney would not be a competent witness against him in the murder charge under Rule 601(b) because she was not the murder victim.

¶38.    The trial court denied Moates's severance motion, finding that severance would be improper because each crime occurred within "a very short . . . window of time" and arose out of a "common nucleus of operative facts."  The court further found that Cortney would be a competent witness against Moates on all the charges against him for "the reasons put forth in [*Maiben*,]" where the crimes were so interconnected that even the murder charge created such a controversy between Cortney and Moates that the spousal privilege was destroyed.

¶39.    Moates asserts on appeal that Cortney was incompetent to testify against him on the murder charge because it "does not fall under any of the exceptions [in Rule 601(b)]." Thus, according to Moates, the trial court erred by denying his severance motion.  But Moates's argument ignores the supreme court's holding in *Meeks*: where multiple charges involve

15

different victims, and the wife is the victim of one or more of the crimes, then she is competent to testify against her husband if the charges "all ar[i]se out of the same episode or occurrence or . . . were bound by a common nucleus of operative fact." *Meeks*, 604 So. 2d at 754. Under these circumstances, a "controversy" exists between the spouses even with respect to crimes in which the wife is not the victim. *Id.* In other words, "the sanctity of the marriage ha[d] already been destroyed," so the spousal privilege no longer applied. *Maiben*, 405 So. 2d at 89.

¶40. These circumstances plainly exist here. Moates killed Cortney's boyfriend in front of her after invading her home and threatening Cortney that "[n]obody better find out about this." All three crimes in this case were interwoven and occurred during a short period of continuing violence. Under these circumstances, we find no abuse of discretion in the trial court's denial of Moates's severance motion based upon the principles explained in *Meeks* and *Maiben*.

## II. Evidence of Moates's Prior Threats to Cortney and Others

¶41. Moates asserts that the trial court erred when it allowed the State to introduce Rule 404(b) evidence of Moates's prior bad acts through the testimony of Cortney's best friend, Brittany Tanksley. *See* MRE 404(b). We disagree and find no abuse of discretion in the trial court's ruling admitting this evidence at trial.

¶42. Moates's defense at trial was that he killed Tyler in the heat of passion. To disprove this theory, the State presented evidence that although Moates did not want a divorce,

16

Cortney wanted no relationship with him other than that of a co-parent; Cortney left him after he "put his hands on [her]"; and Moates deliberately and intentionally broke into Cortney's home and killed Tyler. To this end, the trial court allowed the State to present evidence about constant arguments between Cortney and Moates and about Moates threatening to kill Cortney and Tanksley just weeks before the incident.

¶43. In particular, while Tanksley was testifying at trial, the State informed the trial court that the State would seek to offer evidence of Moates's prior bad acts involving Cortney through Tanksley. The prosecutor explained that when he talked to Tanksley just before trial, she told him that shortly before the incident Moates threatened to kill her and Cortney. The State sought permission to admit testimony surrounding this event and made a proffer of what Tanksley's testimony would be.[6]

¶44. The defense argued that the testimony would violate Rule 404(b) as evidence to prove bad character and that Moates acted in accordance with that character. The defense also argued that the evidence was "purely prejudicial." The trial court allowed the testimony, finding that the evidence was probative of Moates's "state of mind" and "the status of the relationship" between Cortney and Moates. Further, in the course of the parties' arguments, the trial court specifically acknowledged that for exclusion, any probative value must be

---

[6] Tanksley testified that she had recorded the conversation in case she needed it later, and she sent the recording to Investigator Montgomery. Investigator Montgomery testified that he had no record of this recording, and the trial court noted on the record that no such recording had ever been received by either the State or the defense.

"substantially" outweighed by the danger of unfair prejudice, not simply "prejudicial." MRE 403.

¶45. After the trial court's ruling, Tanksley testified before the jury that she "constantly on and off" heard arguments between Cortney and Moates and that, within weeks before the incident, Moates threatened to kill her and Cortney while he was on the phone with them. On cross-examination, Tanksley testified that she did not mention the threats in her statement to police "because those threats were nothing new."

¶46. "[W]e review the [trial] court's admission of evidence for abuse of discretion." *Parks v. State*, 228 So. 3d 853, 868 (¶58) (Miss. Ct. App. 2017). Relevant here, Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." MRE 404(b)(1). Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). This list is "not exclusive." MRE 404(b) advisory committee note. Thus, before admitting evidence of a defendant's prior bad acts, the trial court must find that the evidence is offered for a permissible purpose, and then, pursuant to Rule 403, the trial court must find that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Jones v. State*, 920 So. 2d 465, 475 (¶32) (Miss. 2006).

¶47. Moates asserts that the evidence Tanksley offered did not serve any of the purposes

18

under Rule 404(b)(2). We disagree and begin by reiterating that the permissible purposes listed in Rule 404(b)(2) "are not exclusive." MRE 404(b) advisory committee note. We find that Tanksley's testimony was introduced not to prove Moates's character or that he acted in conformity to it. Rather, the evidence showed a continued pattern of violence toward Cortney and those she cared about. This evidence is probative because it shows that Moates acted intentionally and not in the heat of passion when he came to Cortney's home, broke in, threatened Cortney if she told anyone about the incident, and then shot and killed Tyler. In short, as the trial court found, the evidence was probative of Moates's state of mind, as well as the status of their relationship.

¶48. Moates also asserts that even if Tanksley's testimony about Moates's threats were admissible under Rule 404(b), the trial court still erred in admitting this evidence because the court did not weigh the evidence under Rule 403. According to Moates, the evidence was not probative of whether he committed first-degree murder of Tyler. As explained above, however, we find that the evidence was probative of Moates's state of mind—i.e., whether he acted intentionally or in the heat of passion. As such, Moates's argument on this point fails.

¶49. Further, to the extent Moates asserts that the trial court erred because it did not make an on-the-record Rule 403 analysis, we find that even if this were true it does not warrant a new trial as Moates argues. We find that the supreme court's discussion of this point in the Rule 404(b) context is instructive. In *Jones*, for example, the defendant argued that his due

19

process rights were violated when the trial judge did not perform "an on-the-record Rule 403 balancing test" when determining whether certain evidence was admissible pursuant to the exceptions found in Rule 404(b). *Jones*, 920 So. 2d at 476 (¶34).

¶50. The supreme court disagreed, first recognizing that "[w]hen reviewing evidentiary determinations, this Court necessarily accords broad discretion to our trial courts." *Id.* at 475 (¶33). The supreme court explained that

> while we clearly interpret the rules of evidence as requiring that all otherwise admissible evidence be "filtered" through the balancing test set forth in Rule 403, we do not interpret this requirement to be a regimented procedure that must be explicitly performed on pain of reversal. Though this Court certainly expects trial judges to have considered Rule 403 in making their evidentiary rulings, we certainly do not predicate the soundness of these determinations on the express use of magic words. . . . [O]ur review depends on the evidence and not the judge, and while a judge's on-the-record analysis is recommended as it serves to fortify the judge's position for purposes of review, the lack of such analysis is harmless unless we deem the evidence to be patently prejudicial.

*Id.* at 476 (¶34). The supreme court found that the Rule 404(b) evidence admitted in that case was not "patently prejudicial" but, rather, was "properly admitted as its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Miss. R. Evid. 403." *Jones*, 920 So. 2d at 476 (¶34).

¶51. In the case before us, although the trial court did not make a detailed, on-the-record Rule 403 analysis, it is apparent that the court "filtered" the proffered evidence through the Rule 403 balancing test. *See id.* Based upon our review of the hearing transcript, we find that the parties addressed the Rule 403 balancing test in arguing whether Tanksley's testimony would be admissible, and it is evident that the trial court considered these

20

arguments in ultimately making its ruling. Indeed, at one point during the parties' arguments, the trial court specifically acknowledged that the applicable test is not whether the evidence was "prejudicial," but rather it must be "substantially more prejudicial than probative." Nor do we find that the evidence admitted was "patently prejudicial." *Id.* On the contrary, it was probative for the reasons stated and certainly was not "patently prejudicial" in light of the numerous texts and messages Moates sent and calls that he made, as well as the evidence detailed above concerning the evidence gathered in the course of the investigation. For all these reasons, we find no abuse of discretion.

### III. Sufficiency of the Evidence for Simple Domestic Violence

¶52. Moates asserts that his conviction for simple domestic violence under Mississippi Code Annotated section 97-3-7(3) (Rev. 2020) (involving spouse) should be reversed and rendered because the evidence was insufficient to sustain that conviction. When reviewing the sufficiency of the evidence, we must ask "whether, viewing the evidence in the light most favorable to the State and giving the State the benefit of all favorable inferences reasonably drawn from the evidence, any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Chisholm v. State*, 365 So. 3d 229, 245 (¶66) (Miss. 2023). For the reasons addressed below, we are not persuaded by Moates's assertions and find that the evidence presented was sufficient to allow a reasonable juror to find that Moates committed simple domestic violence in this case.

¶53. Section 97-3-7(3)(a)(iii) provides, in relevant part, that a person "is guilty of simple

21

domestic violence who: . . . [a]ttempts by physical menace to put [the person's spouse] in fear of imminent serious bodily harm." Consistent with this description, Count 3 of Moates's indictment charged him with simple domestic violence occurring in this manner, as follows:

> [O]n or about December 23 or 24, 2020, in Lincoln County, Mississippi, and within the jurisdiction of this court, Richard Moates did wilfully and unlawfully attempt to by physical menace to put another (Co[]rtney Moates) in fear of imminent serious bodily injury by threatening the said Co[]rtney Moates, all at a time when Co[]rtney Moates was the estranged wife of the said Richard Moates; all of said conduct on the part of Richard Moates being contrary to and in violation of [Mississippi Code Annotated] [s]ection 97-3-7(3) . . . .

¶54. Moates asserts that the evidence in this case does not support a finding that he attempted by "physical menace" to put Cortney in fear of imminent serious bodily injury by threatening her because Cortney never testified that she was afraid. Nor did Cortney testify that Moates said anything to her, specifically, or threatened her in any way. Moates relies on *S.B. v. State*, 566 So. 2d 1276 (Miss. 1990), to support this argument, but we do not find it analogous.

¶55. In *S.B.*, the trial court adjudicated S.B. a delinquent for willfully and unlawfully attempting to put another in fear of imminent serious bodily harm after S.B., a thirteen-year-old minor, squeezed a pregnant woman's bottom at the library, causing her to become "visibly upset, emotionally distraught, and fearful of the effect of this incident upon her unborn child." *Id.* at 1279. The supreme court reversed the ruling, finding that under these facts, there was "no proof of fear of imminent serious bodily harm," and, thus, the State failed to prove an essential element of the simple assault charge. *Id.*

22

¶56. We do not find Moates's reliance on *S.B.* persuasive because the facts in that case are not even remotely analogous to those before us. Rather, we find that *Brown v. State*, 633 So. 2d 1042 (Miss. 1994), offers a better example of what it means to "physically menace" another person under circumstances similar to the facts here.

¶57. In *Brown*, a woman was raped by a strange man who broke into her home in the early morning hours. *Id.* at 1043. Her young daughter was asleep in the room and woke up when her mother began screaming during the course of the rape. *Id.* The young girl also began screaming. *Id.* The defendant pointed a gun at the girl and told her to "shut up." *Id.* At trial, the young girl testified "that she was afraid of getting shot when the gun was pointed at her." *Id.* The defendant was convicted of aggravated assault of the girl. *Id.*

¶58. On appeal, the supreme court considered the sufficiency of evidence to support that conviction. *Id.* at 1042. Because the defendant did not touch the girl or make any advances toward her, the Court found that the evidence of aggravated assault was lacking. *Id.* However, the supreme court also held that "the same evidence shows conclusively that Brown attempted by physical menace to put [the young girl] in fear of imminent serious bodily harm." *Id.* So the Court remanded the case so that Brown could be sentenced for simple assault. *Id.*

¶59. Consistent with the holding in *Brown*, and based upon the applicable standard of review, we find that "any rational juror could have found the essential elements of [simple domestic violence] beyond a reasonable doubt" in this case. *Chisholm*, 365 So. 3d at 245

23

(¶66). Specifically, we find that there was sufficient evidence to show that Moates acted with the intent to put Cortney in fear of serious bodily harm and took steps to do so when he broke into her home late at night, smashed the glass of the door to her bedroom, held onto Tyler (who was begging for his life) in the doorway, and threatened Cortney that "[n]obody better find out about this" before drawing his gun and shooting Tyler in front of her. We recognize that when Cortney was asked at trial how she felt when Moates said "[n]obody better find out about this," Cortney said she was "confused," but this honest response in no way changes our decision in light of the overall circumstances we have described. Accordingly, we find sufficient evidence exists to support the conviction for simple domestic violence.

### IV. Retroactive Misjoinder

¶60. Moates asserts that if this Court finds the elements of simple domestic violence were not proved in this case, then the doctrine of retroactive misjoinder requires that his remaining convictions for first-degree murder (Count 1) and home invasion (Count 2) be reversed and his case be remanded for a new trial on these two Counts. The doctrine of retroactive misjoinder was adopted by this Court in *Williams v. State*, 37 So. 3d 717 (Miss. Ct. App. 2010). It "occurs when a trial or appellate court determines that while joinder of two or more counts against a defendant was initially proper, one or more of those counts should be vacated." *Id.* at 721 (¶9). Further, "if the defendant can show that he suffered clear and compelling prejudice as a result of the evidence introduced to support the vacated count, he

24

is entitled to a new trial on the remaining count(s)." *Id.*

¶61. As detailed above, however, we find that sufficient evidence *does* support Moates's simple domestic violence conviction, and, thus, Moates's retroactive misjoinder argument is moot. But even if we had not reached this conclusion, we find that a reversal of Moates's other convictions would not be required.

¶62. Moates asserts that evidence of prior domestic-violence incidents between himself and Cortney and his threats to kill Cortney and Tanksley were only admissible to prove simple domestic violence, so he contends he is entitled to a new trial for first-degree murder and home invasion. We disagree. As addressed above, the evidence about the way Moates treated Cortney and his threats toward her and others was offered as evidence of the status of Cortney and Moates's relationship and Moates's state of mind at the time he committed *all of his crimes*—crimes that were interwoven and committed as part of the same occurrence. As such, the trial court did not err in denying Moates's motion to sever. Nor can Moates show "he suffered clear and compelling prejudice" as a result of this evidence being admitted because it was admissible as evidence for each count of Moates's indictment. Accordingly, the doctrine of retroactive misjoinder does not apply in this case.

¶63. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**